And we would ask that the court reverse the conviction. Thank you. Our next case for the day is United States v. Mark et al., Mark, Swan, et al. Mark et al. Counsel, perhaps we could have an indication. Usually we know whether time is being divvied up or not. Am I safe as soon as I recall that you are the only counsel who is arguing? Yes. Thank you, Mr. Court. Good morning. Good morning, counsel. Good morning, counsel. My name is Pamela Cologne. I represent Mr. Gillian Mark, an appellant and defendant in this matter. And as I just stated, I will be arguing on behalf of all the parties in this case. At this time, I would like to reserve three minutes for rebuttal. That's grand. Thank you. We are here today because the record below does not and cannot establish that the trial judge exercised scrupulous and extraordinary care prior to dismissing this jury, as has been mandated by the Supreme Court for the protection of our client's right not to be prosecuted in repeated times. There was a finding of manifest necessity that then supported, or according to the judge, supported his decision to declare a mistrial. But significantly, Your Honors, that finding of manifest necessity and the declaration of a mistrial did not come until long after the judge dismissed the jury. Well, the same day, right? Yes, but he had already dismissed the jury. And the significant point of that is that none of us had an opportunity to discuss with the judge alternatives or other possibilities or what should have been done. The record belies that assertion. In fact, there is extended discussion and statement about whether we can see the jury. We know it's inevitable. There's a lot of discussion on the record, and I've got to say that with respect to the alternative to manifest necessity, there appears to be some assent or lack of objection by all counsel other than yourself. Well, Your Honor, let me take both of those. I mean, Moses's counsel said the only alternative I see under the rules is a mistrial. I wish there was something else we could offer you, but I'm not going to waste your time. The attorney for Fagan indicated consent, saying it's been six days, Your Honor. I don't think they're going anywhere, and I think this is in the court's hands. And the attorney for Swan said they didn't believe this manifest necessity, but asked the court to render a position. There's not objection on the record, so I'm wondering about the idea of consent to this by other counsel. This is exactly – points out exactly my concern and what I was trying to get across here. The judge dismissed the jury from discussing further the matters that they claimed they could not reach a unanimity on, and he did that at page 158 and 159 of the appendix. He did that before he discussed – before the words manifest necessity even arose in this case, before the words mistrial arose in this case, before the words home jury arose in this case. The first time the word manifest necessity comes up in this case is when the counsel for Swan mentions it, and that's, I believe, at page 171. So that is long after he's already instructed the jury, you aren't going to talk about this matter anymore, you're not going to talk about these issues anymore, you're done with it. And they ask when it first comes up, well, are we supposed to be looking just for a phrase, or aren't we allowed to look at what's going on here and what is really in the mind of counsel in the court in their observations of where the jury is and its deliberations? I don't think we're limited to magic words, are we? No, I agree, but there was no discussion at all prior to page 158 and 159. Other than the discussion that occurred when there was an objection, I believe it was my objection, and I believe I was joined in that, to the timing of the modified Allen charge that had been previously given. There was discussion at that time, and then there was a second note and the judge just said I'm going to instruct the jury. Could you at that very point say, wait a minute, judge, would you like to poll the jury? We had asked him to poll the jury. In fact, I believe it was Attorney Capito for Defendant Moses. We asked him, and I think he actually really got to the point with what he asked. He said, can you ask the jury what does this note mean? Does it mean there's no hope of you ever reaching a resolution on these matters? And the judge said, I would never do that, that that would be invading the problems of the jury, and that is directly contrary to what Webb instructs ought to be done. But it seemed like in the colloquy that was going on between the court and the attorneys, that the attorneys seemed to be aware that the jury was going nowhere and that a mistrial would be ordered. At some point in that dialogue, I thought somebody would stand up and say, yes, but we would like the jury polled on its current status. And you say somebody did that? Somebody did do that, Your Honor. Could you give me a reference? I can't do that, sir. It was at page 98. Page 98. What was the judge's response? I would never do that. That would be invading the problems of the jury. Let us say, assuming there's no reason to question your representation, does the judge have a non-resolution to polling the jury? I believe under the instruction of Webb, he does, particularly in a case like this. And the problem is... Well, let me, in State v. Hewitt, you might be familiar with the case. In our case, we said that the Supreme Court precedent on declaring mistrials in every, did not, in every instance, require a thorough examination of jurors. I mean, that's our precedent. So, if we follow that, we would have to say that the trial judge did not have to poll the jury. That is part of your precedent, but your precedent is also Webb. And in Webb, you, as a circuit, you know, we're also following the instruction that one of the ways to ensure the scrupulous care, the necessary care, before you declare a mistrial is, in fact, to poll the jury. In order to turn it into two ways, but it's not mandatory. It was one of the things that we pointed out could be done. And it should have been done, Your Honor. The reason it should have been done, Your Honor, is because when you look at the other factors that go into determining whether you've reached a point where there is manifest necessity, one of them is what the jury is actually saying. The first note came back, and it said, yes, there are eight notes here, but really only two deal with this issue. The rest were issues about personal matters. If you have a precise statement of the notes, that would be helpful. And it's problematic because the judge did not put, he put the precise language of one note, or at least he says he was quoting it. And if you could give me one minute, I can give you the exact site. The first note, I believe, said that the jury had reached a verdict as to some matters. We cannot come to a unanimous decision as to some matter before. I believe the reason that the court wasn't giving us the full quote was because the do-so-may-have-been-revealed depending on what the note said. And we did say what they had reached a decision on and what they hadn't reached a decision on. And at that point, the judge wasn't willing to advise us that specifically. But he did say we cannot come to a unanimous decision. That was part of the note. And the other part of the note, the first part of the note, was we reached a partial verdict. Well, in my opinion, and based on the note itself, and I think it was clear even from the judge's perspective, that that note was more or less a progress report. That that wasn't any sort of indication that they had a deadlock or that they were hopelessly deadlocked. They were advising the court, okay, here's where we are now. We've got a verdict on some of it. We haven't reached a unanimity on others. We want to let you know. And, in fact, over my objection about the timing of the modified ad hoc charge that was given, the court said, and this is at page 104 of the record, and, again, he quotes the note, and where I was quoting just a minute ago, it was at page 97 of the record. He says, the reason the court wants to give it is because the language says we cannot come to a unanimous decision. That's the summary of the report. And there is a risk of some confusion with a partial verdict and the inability to reach unanimity on a matter that they are considering. So to clarify that a returning a partial verdict doesn't mean stop work on everything, that's why the court was inclined to give a modified ad hoc charge at that time, not because they were ready for it. There was no inquiry by the court to find out, does this mean there's actually no possibility of having reached a complete and total impasse? And, again, there was nothing the court did. All the communication between the court and the jury was through the court person. What question would you have put to the jury in polling the jury, and what information would you have gleaned that would have helped your case? I think it would have been very important to ask each, first to ask the court person, does this note mean, and each time the notes came up, does this mean that you will never be able to reach a verdict? Have you reached that pass that you are at a total point, that you are at a total, complete impasse? And then I think it would have been required that you then ask each juror if they agree with that sentence, because it should not be just the court person giving that opinion. You don't think the contents of the notes were sufficient to answer that question? Absolutely not, sir. As I said, the first note I believe is more of a promise report, and even the judge said, I just want to make sure they're not confused. He didn't say I'm giving a modified out charge because I believe they're at an impasse. He said, I don't want them to be confused if they're supposed to stop. I want to make sure they know that they should go on. How long was the trial and how long were the deliberations? Okay, Your Honor, the trial itself, the taking of testimony lasted 14 days, which was one day of closing arguments. So it was a 15-day trial. There were 28 witnesses in total, many expert witnesses, and the deliberations began approximately the afternoon of the 26th of September. Wednesday? Yes, Wednesday afternoon. And at that time, that's when the jury was discharged from deliberation. However, they had been sequestered, and they had been sequestered unsuspectingly. So the very first thing they had to do, the marshals all took them home to gather their things. So we don't know if they actually began deliberating that day or what time they did. That was Wednesday? That was Wednesday. There was deliberation all day Thursday. There was deliberation until 5 o'clock on Friday. There was deliberation a half day on Sunday, which would have been the 30th. And there was deliberation of about an hour and a half to two hours on the Monday morning of the 1st. So there was about three and a half to under four days, under four days of deliberation. Three and a half to four days. And when did the notes come in? The first note came in on the Friday, I believe. So that was at two and a half days. And then they were kept together, sequestered, and then they deliberated Sunday morning. Correct, half a day. And how about when was the next note? That was Monday morning, after about an hour and a half to two hours. So less than— There was this issue with the jurors that there was a— Yes, and that's another thing. There obviously was some sort of ceasing of deliberations at some point, because there was a note that came from the juror. One juror who was refusing to deliberate at one point because— She made a remark about one of the defendants. Right, and she was offended by that and felt that there was no ability to fairly deliberate that. She was brought here by the court. That matter was dealt with by the court. There were some objections to the matter in which it was dealt with. But in any event, she did deal—she did go back, and it did appear, and it seemed that they were able to return the verdict, that they did continue to deliberate. But again, your point is well taken. That also detracted from the amount of deliberation time there, because we don't know exactly how long she was refusing to deliberate dealing with that issue. So that's why I say I know it was under four days. It was probably closer to three days, but somewhere between three and four days on a 15-day trial. And that simply was too fast to declare what had happened there. Your Honors, I do see my time is up. If you don't have any further questions, we would request that you reverse the judgment of the order of the trial court and grant the motion to dismiss based on the violation of our double general clause. Thank you. Good morning, Your Honors. Good morning. Delia Smith on behalf of the United States. Good morning, counsels or defendants. We know that a request was made to pull the jury, and the judge said he really couldn't do that. Was anything further indicated to the judge that that really would be a practice that would probably be advisable here? Your Honor, I think what is more important than simply stating that a request to pull the jury was made is the manner in which the defendant attempted to pull the jury, which would have, in fact, interfered with the province of the jury's deliberation. To ask a jury how they stand, whether or not continued deliberation is somehow going to repair and replace their inability to meet and reach a unanimous verdict is improper. So it is not the inquiry. It is the manner in which they attempted to inquire. And that's what's wrong. Our case law says it is important to find out from the jury whether they are hopelessly deadlocked and whether further proceedings would assist. And if this has been done here— But that is exactly what occurred. It occurred at least four times, Your Honor. It occurred on every occasion that the jury communicated to the court that they were unable to reach a unanimous verdict. But the court did, in fact, inquire. Could you list those four times, given the Wednesday, Thursday, Friday, Sunday, and Monday days of deliberation? First of all, the account given by counsel for defense is not entirely accurate. Can you give us the appendix? Give us what did happen, your version. If I can reach for the appendix. Ms. Colón said that trial was over by around Tuesday or Wednesday, and deliberations really started on a Thursday. That is not correct. Okay, go ahead. Your Honor, the deliberations began on Wednesday. Deliberations continued Wednesday. And, yes, there was a brief interruption where, before the deliberations began, the jury was, in fact, at the decision of the court to sequester the jury. There was a brief delay or interruption as far as them getting to their deliberations because they were allowed to leave the courtroom, get their personal belongings, and return. They all had suitcases, didn't they? That's correct, Your Honor. But we don't know how long that took, do we? But we do know that they were—we remained in this building no earlier—no, we never left this building any earlier than 7 p.m. on a daily basis. This jury didn't work till 5 o'clock. This jury worked at its own discretion, knowing that they were sequestered, knowing that they were not leaving the court for any other outside business other than the deliberation of this trial. They worked at their pleasure. Every evening, all counsel can certainly admit that we worked until 8—I'm sorry, 7, sometimes even as late as 8 o'clock. I was curious about the sequence of the notes and when they told the judge, we are hopelessly dead wrong. Your Honor, that happened on two different occasions. I'm sorry, on—the first note came was as to a partial—we have a partial verdict. We cannot reach a unanimous decision on the remaining— Is that on Friday? Is that on Friday? If I recall, it was, Your Honor. Okay. Then there was a Sunday— Was the Allen charge given after that one? Yes, it was, Your Honor. Okay. But that was—the Allen charge was given after the third note, not the second. When was the second? The third note. When was the second? The second was over the Sunday. And then Monday, when jury selection—I'm sorry, jury deliberations continued on that Monday. Again, another charge. Your Honor, this circuit has said—has spoken to— After? Monday. Monday after the third note. I believe it was—I believe it was Monday. If I'm not mistaken, it was either Sunday or Monday because we worked the entire weekend. All right. It had to be Sunday because there's a charge that was given—a claim that was given prematurely, so there had to be deliberations after that. Your Honor, I stand corrected that it would be Sunday. But at Sunday, we're still talking about Wednesday half-day, Thursday full-day, Friday full-day. We're still talking about two-and-a-half complete days of deliberations. I'd like to—I just wanted to get your take on Ms. Colon. I think Ms. Colon was portraying a picture of this trial as a very complex, lengthy trial involving multi-counts, multi-defendants that lasted—I can't remember when it was—14 days? 15 days. 15 days. And it seemed to me, I mean just at first blush, that the period given for deliberations was a little bit brief. In other words, that maybe the court pulled the trigger on deliberations a little too quickly. No, Your Honor. That is not correct. This court acted deliberately and very responsibly. Not only did the court act responsibly in asking, seeking suggestions on the issue of the jury's inability to reach a unanimous verdict. When we were taken back into chamber and the counsel, all of us, were asked by this court, what alternatives do you see to a misdemeanor? What should the court do? What is your position at this point where we've had deliberations for five days and the jury cannot reach a unanimous verdict? They explained in writing that this is an inability to make a decision. What is your— Let me ask you a question here. We don't have any statement by the jury of hopeless deadlock or any statement from them that portrays exasperation, if you will. And we don't have a record as to the body language that may have been involved. Now, we do have statements of some counsel almost conceding that they're just not going anywhere. Would an evidentiary hearing as to manifest necessity be worthwhile in a situation like this, where there can be evidence taken of the perceptions of those in the room as to what the jury was going through and the likelihood that, you know, for all we know, maybe they're going to engage in fisticuffs if they had to stay together anymore. And they were—I mean, a lot goes on in a courtroom that we sitting in an appellate court can only surmise from the statements of some people. Would an evidentiary hearing on this issue be of value? Your Honor— I'm very inclined that if there's an evidentiary hearing that helps, I mean, it could resolve this. Your Honor, to go further to require the court to keep an evidentiary hearing would be to absolutely negate, to ignore, to undermine the findings that the court has made in the record. The court has preserved the record. The court has made findings after findings as to the jury's inability. And the court is in a best position to tell us that this jury is, in fact, deadlocked. All right, but we're reviewing what the court has done. And if the court has decided there was manifest necessity, we are obligated to second-guess that, if you will. Yes, Your Honor. And if the record could be enhanced through the perceptions of those who were in the courtroom as to how likely it was that this jury was going to be able to deliberate further. I mean, I was a trial judge, and, you know, very often I would put on the record exactly what I observed as to the jurors' impatience or exhaustion. Well, Your Honor, I would agree that if you were only considering what the court did, then that would be a reason to pause. But this record shows that the defendants themselves conceded to a mistrial. None of them, when posed the question of mistrials or alternatives to mistrials, the defendant says, Your Honor, it's in your hands. We will look at it. Essentially, they conceded. Every last one with the exception of one. So that, Your Honor, shows— No one voiced an objection other than—  As the defendant stated, the court met with counsel again. Now, this was the second meeting that we had after notes were returned about inability to reach unanimous verdict. The court met with counsel. This is the second meeting, and solicitated suggestions as to alternatives for a mistrial. Now, when asked for suggestions, appellant, the counsel stated that—appellant Sloan, counsel stated that the court should rule, Your Honor. The court should rule, and that is our position. That, Your Honor, is what the record showed. So we don't have to just revive what the court did or how the court ruled or how it acted and why. We see that there is a unanimous agreement, meeting of the minds, by counsel for the defendant, the court, counsel for everyone. We're all agreeing that there are no alternatives, manifest necessity, as this court has stated time and time again. A mistrial is a perfect—inability of a jury, a hung jury, is the perfect example where manifest necessity exists. You said something earlier that I was interested in. My experience is that polling jurors is a lot more common in civil context than in criminal context. You had said that if you do it in—in this case, you're essentially intruding into the deliberative process of the jury. No, Your Honor. It's not—it's not the inquiry. It is the type of inquiry that was being asked, the specific inquiry that counsel for Moses was asking the court to do, Your Honor. He was asking them to—Your Honor, would you skirt your question? Would you phrase it in a form where we could determine how the juries stand, whether or not further deliberations— Oh, you mean in terms of the partial verdict? Yes, Your—well, after the second meeting as to the jury's inability to meet or to come to a unanimous verdict. So, Your Honor, it's not—the suggestion is not that polling is improper or inquiry is improper. What the court did and said is that the type of inquiry that you're asking the court to make would, in fact, interfere with the province of the jury's right and freedom to deliberate. Do you remember— Finally, if I can cite where that's said, counsel, Mr. Capito, said if you were to ask them to go back and return to deliberations, are they sure that it's not going to change or would further deliberations be a waste of time, which is another way of asking about hopelessly deadlocked, and that's when the judge says, no, the court could never do that. I would be poking into their deliberative process. I either give them an outing or I don't. An outing was given, Your Honor. All right, but I'm saying what was suggested that the court do was not something untoward. It would, in effect, have asked them whether further deliberations would be a waste of time, and that's the classic question that is asked upon polling of a jury, is it not? Your Honor, I think that the record shows that the judge in this trial exercised all due diligence, was very responsible in his approach. I just wanted to make clear exactly what was being asked of the judge. Well, Your Honor, again, I believe that in every case, the more information the court has to consider is going to better equip the court in making its decision, but that does not mean that the court in this record alone does not have sufficient facts to rely on which to decide that not only did the court agree, but counsel joined in that agreement. Counsel, can I ask a question on what Judge Rendell just read? Was the concern that they might change their – they've already decided part of the case. There was a quote in there about changing. Was there a fear that they might go back and reconsider what they'd already decided? I'm not – I don't recall that, Your Honor. I don't remember that being one of the concerns of any of counsel. If it is, it's just my recollection. I don't recall that being a concern. Can I ask you a question, too? Counsel came out of the box with that the jury was discharged, and later on the judge put on the record his reasons and, you know, manifest necessity. Is there anything wrong with that? Your Honor, the jury was, in fact, discharged. Was there anything wrong with the procedure that the judge followed? No, Your Honor, because even before the jury was discharged, counsel – we had numerous meetings with the court concerning this jury's lack of ability to reach a unanimous verdict. So, Your Honor, what the court actually did in the interest of time was to put the objections on the record after having released the jury. But we had met on numerous occasions in the court's chamber regarding these inability to meet and reach a unanimous verdict. That's where an evidentiary hearing in this type of situation might help us understand the record. I just note that. We've had a recent situation where, in fact, we've sent a similar case, no polling, but where we have absolutely no indication of what counsel was thinking or doing. And an off-the-record conversation, and we're sending it back for an evidentiary hearing. That's why I asked whether it would be relevant here. Well, Your Honor, I think that one of the things that is so very important here is to look at the fact that having four weeks – even though it's 15 days, it was a month long trial – and six days of deliberation with eight different notes all suggesting one way or the other that we cannot reach a unanimous verdict is almost like beating a dead horse. The jury could not reach a unanimous verdict. But the judge, his actions were responsible. His actions were reasonable considering this jury's inability to meet a verdict. And the defendant conceded that there were no alternatives to declaring a mistrial manifest necessity. Thank you. Thank you. Ms. Blum? Yes, Your Honor. Again, we would ask in closing that the court confirm or affirm – I'm sorry – the ruling of the lower court. To clarify one of the questions that came up, the modified gallant charge was given on Friday the 28th, September 28th, and you'll find it in the appendix, page 107. I would note, just so that you're aware, there is a mislabeling of the first page of that transcript. It says Thursday, September 28th. It was actually Friday. So there's a mislabeling of that. But it was September 28th. It was Friday. It was only two days after they began deliberating. And the six days of deliberation, while that went on, after the jury was discharged as to these issues, the remainder of those days had to do with drug amounts and forfeiture. And that's what those deliberations were about. It had nothing to do with the majority of the counts or the matters that were here before the count. And as Judge McDowell pointed out, we never heard from the jury that they were hoping to do that. There were three notes about personal matters. There was one note that they wanted to go home on Friday, and that takes care of four notes. There were two notes that we discussed. There was another note, a seventh note, that allowed – that told the judge to ask the jury, do you want to return your verdict now, your partial verdict for now, or do you want to hold on to it? And they sent a note back saying, no, we want to return the partial verdict now. And the other note was about this juror who said that she wasn't going to deliberate because of the disparaging remark that was made. So of all eight notes, two go to this issue. So it's not enough to say that there were eight notes here. In any event, none of them ever indicated any sort of hopeless deadlock at any date. That is exactly the point. What Mr. Capito requested is exactly what the judge should have done, and it is exactly what this court has said in effect. When it's not done, you do not furnish an adequate showing that it was the collective sentiment of the jury that they had reached an in-house. So not only do you have to find out whether they actually have a permanent in-house, but you've got to make sure when you call each juror that they agree. What about the deference that we owe to the trial court in this matter? The trial court there has lived through the deliberations of, this is not a situation where the trial court is doing this so as to catch a plane or something else. We've had some of these cases. It's not trying to pull the trigger here. Don't we owe some deference to the trial court? If he had made a finding of fact, I would agree with you, but he made absolutely no finding of fact. He didn't even find on the record that they were hopelessly deadlocked. All he did was say, I'm going to discharge the jury, and then later said, I declare this as manifest necessity, that there is manifest necessity. Both of those are not factual findings. Those are legal conclusions. So if there was a finding of fact here, yes, there would be some deference given to the judge, but there weren't, I think, here. I would say that the manifest necessity conclusion is a mixed issue, mixed question. That's true, but he gave no basis for it. He gave no basis whatsoever for it. And I do see my time is up, but I would request permission to address the issue of consent. All right, yes, one minute. Thank you. With regard to that issue, I would like to state that, first of all, Mr. Gessen has been quoted out of context. At page 173, Mr. Gessen said, Mr. Swan requested the court find that there is not manifest necessity in this case, and that is such. And then the court interrupted him and said, well, what do you suggest I do? And he said, the court should rule, Your Honor, the court should rule. And that is our position. Again, referring to what he had just asked the court to rule, that there was not manifest necessity. So obviously, Mr. Swan's objection is clear on the record. I believe I made mine clear as well, as you noted. That's there at page 177 of the record. And please note that I wasn't given an opportunity to do so because the judge wasn't even addressing me. I believe he forgot that my client was not only convicted but also was part of the matter that had not yet been decided. And he asked every other counsel about it, and then I spoke up and said, look, I'm going to be objecting here. With regard to the other counsel, none of them clearly accepted. None of them did. But it can be implied by silence. Is that our case law? In our circuit, I don't believe that that implication by silence is acceptable. In fact, I believe the case law is actually the opposite. And I believe that that's what's found in the recent case that Judge Riddell was just referring to, and that that was a key issue there. In addition to that, I don't believe this court should consider anything that may or may not have taken place in chambers because there's no record of that. There's no record that there even was a discussion in chambers here. What you have is the record before you. And on this record, there was no indication that there was a justification for manifest necessity, and therefore we would ask that you reverse the order and dismiss this matter based on a violation of the double jeopardy clause. Thank you very much. Thank you very much. The counsel case was well argued. We'll take it under advisement to call our last case of the day, United States v. Mark.